May it please the court, my name is Tom Schmidt. I am the attorney representing New York Party Shuttle as well as what we refer to as the non-NYPS petitioners. Party Shuttle tours, onboard Las Vegas tours, Washington DC Party Shuttle and NYC guided tours. All those companies with common ownership you mean? Negative. Nice try. Our point on this is that common ownership does not mean owners in common and that's the distinction between these facts and the rule on common ownership. But honestly I think if the court looks at the testimony, the evidence and the record, the deciding factor on that single employer issue is not so much the difference in ownership but the difference in operations. We had the benefit in this trial of a manager from each of the operating entities testifying with the exception of Las Vegas and saying look I had autonomy on labor relations. I hired my own people, I fired my own people and that factor is the most important in the jurisprudence. But I would like to start with a quote from the ALJ in his opinion where he says the NLRB's case is based on uncorroborated testimony, a lack of documentary evidence and faulty memory. And you can add to that directly contradictory evidence not just from respondents below witnesses but from Mr. Flancer himself where he said oh no my tips were just a wash. I would have made the same amount of tips working for New York Party Shuttle that I made on my own. And of course that's because if he's not doing a tour for New York Party Shuttle he could do a tour for someone else and earn the same tips. However, the ALJ ignored that testimony. Much more importantly the testimony about his moonlighting income. And this is where this case begs for the Fifth Circuit to review the NLRB's decision and in fact reverse it. Because the clear and absolutely uncontested evidence in the case is that this man never once in his life generated $335 of moonlighting income per week. There's one year in the record where he had no job. All he did was work for his own company. And that would have been the source of the moonlighting. And in that one year without having to work another job he generated just barely over the $17,000 in that one year. In every other year, and you can look through the record, he had another job from another employer and his individual earnings, his moonlighting earnings never came close to $17,000. However, the NLRB based their entire back pay calculation on the fact that he got $300, he would have gotten $335 a week every week for seven years. No chance. Was there any reliance on tax returns or any documentation he presented? Exactly the opposite. And this is where it starts getting bizarre. So first of all, you have a compliance officer who was the expert witness at the trial who gave her testimony as to what the back pay should be. She never looked at his 2011 tax return. Could have gotten it, looked at other tax returns, didn't look at that one. Now, this man worked for New York Party Shuttle during calendar year 2011, and that was it. He did get a paycheck in 2012, but that was just for the last days of the year. So if you look at his 2011 tax return, that's the only tax return that could show you moonlighting earnings, right? If he had in fact been moonlighting while working at New York Party Shuttle, it would have been on that tax return. Now, at the time of the hearing, we did not have that tax return. Ms. Kurtzelbehn testified. I looked at 2012 and forward. We said, whoa, Judge, wait a second. We need to see that tax return. We said stop the hearing. By the way, this wasn't like a one-week trial. This thing took months at a time break. So we said, look, pause the hearing, let's get the tax return, and continue Ms. Kurtzelbehn's testimony. The ALJ said no. Okay, we got the tax return. We then asked the NLRB to recall Ms. Kurtzelbehn so that we could cross-examine her on that. Not allowed. Not a fair trial, right? But this court doesn't need to go that far. Just look at the tax return. It's in the record. It shows zero moonlighting earnings. There is no evidence in the entire proceeding that this man ever generated that level of moonlighting earnings. And if you deduct that amount, the back pay goes to next to zero. And the court can look at Petitioner's Exhibit 12 for the resulting amount of back pay. All right. A couple of the legal issues I want to make sure to address. One is jurisdiction. We concede there was jurisdiction over New York Party Shuttle. It engaged in interstate commerce, no problem. The other respondents were added much later to the case, and there's no evidence in the record of sufficient interstate commerce to justify jurisdiction. The NLRB tries to rely on this jurisdiction by fiat. Hey, listen, Washington, D.C. Party Shuttle is a single employer with New York Party Shuttle, therefore there's jurisdiction over D.C. Well, but that's jurisdiction by fiat. They have to first determine whether there's jurisdiction over this separate entity that operates in a separate jurisdiction with different owners before they can then determine that, in fact, they are a single employer. It's chicken or the egg, but the courts and, in fact, the agency should look at jurisdiction before they start making findings as to single employer for purposes of determining jurisdiction. You're going to hear me say this a couple times. Party Shuttle Tours LLC is in a very different situation than the other non-NYPS petitioners because it wasn't an operating company. It didn't have a single employee in its entire history. It never entered into any sales during its entire history. So for jurisdictional purposes, it should be dismissed because it did not engage in interstate commerce. It was merely a holding company. Number two, for purposes of single employer, it can't be a joint employer with entities that have employees if it never had an employee. There's no evidence to suggest otherwise. The next issue is the Noel Canning decision, and there's a lot of mess in this case over this issue. You have New York Party Shuttle that was found to have engaged in an unfair labor practice by a board that was admittedly wrongfully constituted. That entity filed an appeal to this court. That appeal was dismissed on a default. And so the first question is, can that entity now claim that Noel Canning invalidated the underlying unfair practices decision? We think it can. We've briefed that pretty heavily, that a default judgment doesn't decide other issues that were not litigated. And therefore, we believe New York Party Shuttle can assert that, and this court should reverse as to New York Party Shuttle on that issue. But even if that's wrong, the other respondents, the non-NYPS respondents, were not in the case when that default happened. They were never given an opportunity to say, hey, wait a second, you can't hold us liable as a single employer on a decision of the NLRB when those board members were improperly constituted as determined by the U.S. Supreme Court. Did you raise them below? Did you raise the constitutionality? The non-NYPS petitioners did raise it below all throughout the proceeding. But not NYPS. They didn't raise it. Well, NYPS did also, but there is an argument, and I'm just trying to cover a little broader than your question. NYPS did not raise it at the time of the hearing, the original hearing, or on the appeal to the Fifth Circuit, because, of course, the case hadn't been decided yet. So NYPS appealed to this court, a default judgment was entered against it. Later, the Noel Canning decision came down and said, hey, this board's invalid. After that, New York Party Shuttle has consistently raised that objection. And, of course, the non-NYPS respondents never had the chance to raise it because they weren't in this proceeding until after Noel Canning. So we believe— Can I correct that even though there was litigation around the country before the Supreme Court's opinion in Canning about this very issue, the Appointments Clause— Yes. —it was not raised in this case by NYPS? That's true. You then subsequently have, before the Supreme Court's opinion, the hard-to-understand, not well-written D.R. Horton opinion. But it does seem applicable here. Why does it not apply? It seems to me it at least applies to NYPS, and you have your default judgment issue. And if it is single employer, it seems like it would apply to the rest. So at least as of now, it seems like whether D.R. Horton should apply to this situation to these other defendants rises and falls on whether there's a single employer. I disagree with a couple points in that chain. The first is that this is a subject matter jurisdiction issue, which makes it different. In other words, arguably this Court never had subject matter jurisdiction. The NLRB never had subject matter jurisdiction, and so that can't be waived, and we've briefed those cases in Petitioner's Brief. Secondarily, remember that single employer is not the same as alter ego, right? So if there was an alter ego finding approved by the Board, which there was not, then you could say, oh, well, if Washington, D.C. Party Shuttle is in fact the same as New York Party Shuttle for legal purposes, then maybe you could say it should have somehow intervened and raised this issue. But that's not what happened here. These are separate corporate entities with different owners, and Washington, D.C. Party Shuttle as a standalone entity, whether it's a single employer or not, has the right to assert its legal rights in the courts of this land. And so that's the issue. Now, on the issue of jurisdiction, that issue of single employer and whether there is a single employer may have a little closer interpretation if the facts are the same, but they're not. You've got one entity that had no employees, no sales. You've got some that had sales, but they were entirely within the state in which they operated, and yet the NLRB just says, oh, well, we find that they all use the same brand name, and therefore they are a single employer. But when in fact each one had a separate manager local to that operating entity, each one made its own hiring and firing and training decisions, each one had its own books, any financial transactions between the entities were meticulously documented because of the difference in ownership. And all of that test was in there. Now, there's a standard of review issue that comes up here, too, which is the board can't just look at the evidence that supports the ALJ's decision. This court in Intergy, Mississippi held that merely because the board didn't discuss the contrary evidence, we reverse. Why is that? Because the standard for substantial evidence is that all of the evidence in the case must, when reviewed as a whole, must support the decision. That is certainly not the case here. You've got the complainant contradicting himself, not only in his testimony, within his testimony, but his testimony contradicts his tax returns, his testimony contradicts what he allegedly told the compliance officer, no credibility whatsoever. Jumping back to Noel Canning, did the board order here chronologically, did the board order precede Noel Canning or come after? Yes, before. And this court's default judgment on appeal also preceded Noel Canning. Okay, but am I correct that you didn't sort of raise your appointments clause challenge in connection with the appeal of the board order? That's true, but technically we didn't raise anything in our appeal because there was a default judgment entered and we never filed a brief. So that's technically true, but is it waivable? Well, so that's part of the argument, that if we had briefed the case and had a complete decision, the res judicata effect of that decision is much greater. But we've cited cases in the brief that a default judgment doesn't create a res judicata preclusion of an argument like this, particularly where it's subject matter jurisdiction in the first place. You call it a default judgment, notice of appeal was filed, petition for review, whatever it was, and there was no briefing? Yeah, so there was an issue with the transcript, so the deadline . . . What order did this court enter? A dismissal of the appeal? On the basis of default, yes. Well, just failure to brief or whatever, I don't know what we would have called it, but anyway, I just . . . It was actually called a default. Let me ask you about the comparators. You don't have much time left. It does seem to me that the argument, that the comparator that was chosen by the ALJ, you have arguments why that person was never a good comparator. But let's get beyond the time period in which that person actually was employed. And then it was extrapolated to the next four years. Now, I've not gotten into the NLRB's manuals that were linked, I think, in their brief of different ways to make these calculations on lost wages. It does seem to me that there are a number of ways to calculate the proper compensation for somebody who's been improperly terminated for these purposes. Is there another way to have calculated these wages, not even using a comparator, for 2014 to 2018? Well, our position is that there's a couple options here. And we concede there are some challenges in finding a comparator with this company, because so many of these tour guides just come and go, work part-time, work full-time. So, it's difficult. I get that. It seems like it's not a comparator situation if you're extrapolating a time in which they weren't working. Well, absolutely. That's one thing. That the comparator was not working. That's right. And the other thing is that, in this case, what they should have done is they should have either just said, look, we're going to project here's the hours he would have worked by looking at the company as a whole. They could have done that. They didn't. The time period, 2014 to 2018. That's right. For each year. It seems to me it's a cyclical business. It's a seasonal business, but it also could be a cyclical business. Absolutely. Absolutely. What you told me in your brief, so that's the only reason I know that. Absolutely. There you go. So, the other side won't be able to respond. I wanted to get an initial thought from you about it. And two points on that. First of all, if you're going to use him, you should reduce it by 29%, because the comparator they chose worked 29% more hours than Mr. Flancer. So, if you're going to use him, you need to adjust his hours down to be a true comparator. The second thing is, on your point about the projection into the future, I think at this point that's moot. Because the unrefuted evidence is that New York Party Shuttle stopped operating in 2015. And at that point, because there's no successor liability or alter ego finding, Mr. Flancer's back pay has to end as of that date. He can't say, oh, I would have worked at NYC Guided Tours and continued working past October 1 of 2015, because there's no successor liability now. The board, in its brief footnote preceding its approval of the ALJ's opinion, says we're not going to decide alter ego or Golden State liability. I don't know if it said this, but presumably because they thought it was unnecessary. All the rest of this flows from single employer. And we briefed it anyway, and respondent in their brief said, hey, that's not in the case anymore. So it's, you know, they're resting entirely on the single employer. All right, counsel, we have time for about a minute. Thank you. Hello. Hello. Hope you're comfortable without your mask. It does feel a little strange. May it please the court. Kelly Isbell here on behalf of the National Labor Relations Board. Well, if I may, we can start with the comparator employee, if you'd like to. The compliance officer took the average hours for all of the tour guides and compared them to the time that Mr. Flanser worked. So he worked in 2011 from October through December. So she looked at his average hours and compared them to all the tour guides. Mr. Jorge was the tour guide with the closest average hours to him. That's why she chose him. Well, I do think you're on more solid ground when you're talking about the time period in which Jorge, however you pronounce his name, actually worked. It's the projection that matters to me. And I didn't dig into all your procedural rules, but you did link me to something that I went to in a subject that looks too complicated before a little argument. It seems to me there were a variety of formulas, as the ALJ said, a variety of formula you used. And it doesn't look to me like comparator is the right formula when you're comparing something that doesn't exist, which is when Jorge worked in 2014-18, he didn't. So it doesn't seem to me that comparator would be the right approach. It would be one of your many other options. And one of the cases you cite from the Fifth Circuit is talking about projection. You take the time period that Jorge worked, but then you have to show that 2014-18, it seems to me, is comparable to that time period in the business. Not just that you can do the math, but is it fair that that's the right time period? So I guess is there another approach or is this more of a matter of burden of proof? It's up to the employer to show what's wrong, and they didn't. Let's start there because you're right. I mean the general counsel's obligation is to provide a reasonable approximation of gross back pay, and it's the employer's responsibility to come forward with arguments or facts in mitigation. So if the first thing they could do was argue that the comparator formula was the incorrect formula, but they did not argue that. Well, is it a comparative formula, though, when it's covering the time period when your comparator didn't work? The ALJ found what she did to be reasonable, and if you look at the numbers, because you're right, Mr. Jorge did not continue to work after 2014, but other tour guides did. So remember New York City Guided Tours, the other New York City tour company, did have drivers and tour guides on staff. They don't list them out. If you look at the New York Party Shuttle payroll records, employees were divided out by driver, tour guide. The New York City Guided Tour payroll records are not listed by employee type, but I recognize some of the names. And David Roffey, for example, worked the entire time, spanned the back pay period, but he worked many more hours than either Mr. Jorge or Mr. Flancer. So if he had been chosen, she would have either given too much, calculated too high interim earnings, or needed to do something else to bring it down. So there wasn't a good, to me, and remember it's the employer's responsibility to come up with some alternative formula. You have to have a reasonable formula, though. I mean, you have to have, your formula at least has to be reasonable. So that's a threshold that I would imagine your friend on the other side, you didn't meet, because it's unreasonable to use a comparator for a time period when there's not really a comparison going on. But there are tours being conducted, and there are tour guides employed by New York City Guided Tours doing the same kind of tours in New York City. What do you say the law is here? I mean, is this, best I can tell, this is not a burden shifting, but you tell me if it is. So tell me, I mean, I look at the Fifth Circuit cases you cited to us and the other side too, and I don't really see this answered for me. The AOGA says this is the way I'm going to do it. I'm going to use Jorge as a comparator, but he only worked for a year and a half or whatever that overlaps, and then I'm going to extrapolate it for four years further. Does that meet some initial threshold obligation on the part of the ALJ, and does the burden then shift to the employer, or just what is the law on how we are to evaluate whether this is correct? The board in coming up with the back pay remedy, as you know, gets a lot of discretion. So the board's back pay remedy has to be the kind of remedy that effectuates the policies of the act, but there is not a strict standard of review on coming up with a particular formula. The general counsel puts forward a formula that the ALJ and then the board in review can find to be reasonable or not, and trying to break that down or come up with alternative formulas is the employer's responsibility. You mentioned the compliance manual, and I agree with you. There's a lot to it. One reason why the board publishes it is so that all the parties have access to exactly what the procedures are. But there are, I believe, three formulas to use. One is comparable employee that Ms. Kurchlaven used here. One is replacement employee. So if you have a 40-hour-a-week job and the guy who replaced you, you would use his hours. And the third one, I believe, is just using the hours of the discharged employee, and that usually works with 40-hour-a-week jobs. This kind of job, of course, is not 40 hours a week, and the number of hours both worked by Mr. Flanser and worked by Mr. Jorge varies quite a bit. Mr. Jorge's hours varied from zero to I think the most I saw in a week was 39. So on this record, I mean, certainly the board is arguing that the comparable employee formula was a reasonable formula to use here, and the employer has not come forward with any kind of alternative that would have made a better estimate. Well, one of the cases I think you cited could be your opponent, Charlie Topino and sons from this circuit, 1966. And there they used a comparable employer. I won't get into that. They used a different formula initially, but then for two other employees, they used projection of average earnings. By projecting the average weekly pre-discrimination wage of each discharged employee and then projected it for the time period after they were improperly terminated. I don't know if that's any different than what you're talking about, but it's different language, and it's not talking about comparable employees. I don't know how to reach a different result than here, but it does seem to me that it just logically, which my mind is probably not good enough with, but logically it doesn't seem correct to me to call this comparable employee for a time period when there's no comparability. Well, there is comparability between Mr. Flanser and Mr. Jorge. So she did average hours, right? So Mr. Jorge's average hours were closest to Mr. Flanser's. But if she had taken Mr. Flanser's, perhaps this is part of your question, I'm not entirely sure, Mr. Flanser's worked hours and just projected those, so he worked October to December and projected those throughout the years, the back pay would have been considerably higher because that is the high season for the tour industry. It wouldn't have taken into account the low season. And so that is one reason why using the comparable employee formula is more reasonable and more fair, because these employees do not work a set number of hours every week, and it changes by season. Why don't you address what was being discussed about single employer and the necessity for the board actually to have upheld either alter ego or some other theory that it just doesn't work for these other companies now that New York NYPS is no longer with us? The board rested its decision on the single employer findings and made no findings about alter ego or Golden State, which is why I did not brief it because I don't have a board decision to defend. The indication here is that that's not good enough, that single employer can't get you where you need to go is what I understand, insofar as making these other companies liable. Single employer absolutely can get us. Even the res judicata effect of the earlier decision? Yes, Your Honor. If you look at Montana v. U.S., I believe it's a Supreme Court decision, companies that are in privity with the original company still have the res judicata effect. But if we're talking about Noel Canning, the original case, first of all, this court issued mandate. So the correct analysis to start with is recall of mandate and whether extraordinary circumstances have been alleged or shown to recall the mandate. The decision in D.R. Horton was very clear that this court's subject matter jurisdiction does not depend on the validity of the board's order. It depends on Section 10E and 10F of the Act where the petition for review was filed in the circuit. And once a petition for review is filed, you have jurisdiction concurrent with us. Once we file the record, the board loses jurisdiction and you have exclusive jurisdiction. That's how jurisdiction is conferred under the Act. The board's subject matter jurisdiction, of course, is over labor law under the National Labor Relations Act. The validity of the board's decision doesn't affect either its jurisdiction or your jurisdiction. D.R. Horton was very clear that an appointments clause challenge can be waived and should be raised before the board at the appropriate time. Well, I'm not sure I can quite get my mind around the significance of it, but the idea that this court, on the review of the earlier decision that said that there was actual liability here, that there was never any briefing and we ended apparently with actual use terminology of default judgment and our order dismissing the appeal or affirming on default judgment. Why doesn't that matter insofar as we need to recall the mandate as making it more appropriate to recall the mandate because the issue of the propriety of that initial decision has never really been decided insofar as it affects these other potential groups of employers? Let's assume Noel Canning didn't happen. Take all that aside just for a second. If there was an unfair labor practice finding enforced and now we get to compliance and the board has made single employer findings, even though those other employers didn't participate in the unfair labor practice proceeding, if you agree with us about single employer, then they are now liable for all the back pay that came under that unfair labor practice. But now we've got Noel Canning on top of it. So if you recall the mandate, what they've actually asked for in their brief is for another unfair labor practice trial. The way this worked during Noel Canning, and I can point you to, I don't have the number off the top of my head, but the way this court did it during Noel Canning, the Dresser-Rand case was one I looked at. If the issue had been raised to the board at the proper time and raised to the court at the proper time while the case was pending in the Supreme Court, you held those cases in abeyance. Once the Supreme Court's decision came out, you remanded them to the board. The board did not then hold new unfair labor practice trials. It appointed a new panel with the proper appointments, non-recess appointment board members, to review the record and the facts and to issue a new decision. So that's what would have happened in this case if the Noel Canning issue had been raised at the appropriate time. And remember this was in the news. I mean it wasn't just something that only labor practitioners knew about. This was in the Washington Post and the New York Times and I'm sure in other newspapers around the country. Certainly other companies were raising it in this circuit and in other circuits at exactly the same time we were all before you in November of 2013. The D.C. Circuit's decision came out in January of 2013. So do you contend that it's been waived? I do, Your Honor. The constitutionality issue? Yes. Under D.R. Horton, the appointments clause issue has been waived. What value do you put on this case? In what sense, Your Honor? With respect to the damages claim, considering the problem with the 214 to the 218. In terms of monetary value? I mean certainly the board is here defending its decision because the in total, the 2014 to 2018, it is their responsibility to suggest a different way of computing. He was certainly still unlawfully fired between 2014 and 2018. The point of the back pay remedy is to put the employee back as much as possible to the status quo if he had not been unlawfully fired. And sometimes, especially given the length of time, we're talking more than 10 years now, the board has to come up with some kind of reasonable approximation. And using Mr. Jorge, if we had gone with Mr. Rafi or one of the others, the back pay would be higher. I mean certainly using the employee with the closest average hours to Mr. Flancer. It just seems like a lot of time and a lot of effort. I don't know. Have you all tried to negotiate any settlement? I think under the rules of the circuit, I'm not even sure I'm supposed to tell you. So please don't tell Ms. Butler that I answered your question. But yes, Your Honor, twice, in 2013 and again. You can't tell us that. I know. You're going to get me in trouble with her. Yes, Your Honor, we did. Let's say we disagree on only the compensation, only on the issues concerning the use of the comparator, how it was used, some of the other points on compensation, such as the other parts of it. Does that go back to the board, to the ALJ? How is that revisited procedurally? I think it would depend exactly on what your remand order says. I would argue for a remand if there is something you want to be recalculated. I wouldn't want to be the person person. So it's certain components that say this is all that's left and that would be the end of it. But if we're saying this calculation was wrong, you can't do it this way, and we don't have our own calculation of what the amount ought to be.  If you need a definitive answer, I can certainly provide that to the court afterwards. I think what would happen is that the board would then remand back to the regional office so that the people who are actually expert in doing the calculations would redo it instead of a board member, for example. That's good enough. If we want something further, we'll let you know. But if one of your questions is about moonlighting, for example, because you mentioned it's not just 2014 to 2018 that you might have issues with. Well, it's issues raised by your friend on the other side, however many on the actual amount of money. Certainly I think there's some other points he has, too, but as far as the actual compensation, to the extent we accept any of that and decide that the ALJ agreed to by the board, included some things, went about the process wrong, the amount's wrong, just what happens after that. Then you would remand to the board and the board would remand. Anything else? Do you have specific questions? Would you like to talk about jurisdiction? This is maybe kind of related. I'm just wondering what your very best kind of tip-top authority is for the proposition that the NLRB can add defendant companies, that it alleges are single employers at this compliance specification stage. The compliance specification. And why does it not need to add them at the initial adjudication as to whether there was an unfair labor practice? Why can't it do it later? It can do it later because this part of the proceeding is about the back pay, right? So once the board, I don't even know if at the unfair labor practice hearing evidence came forward. Certainly at the compliance stage, single employer was alleged. It is like a separate proceeding. The other side, there's an allegation of specification that is issued by the general counsel's office. The other side has the opportunity to formally answer it, so they file a formal answer. And then we go to trial again. So there's evidence put forward. So even though the single employer issue came up at compliance, that is the time when they get to decide or put on evidence to say they're not a single employer, to dispute that issue. The many issues the board leaves to compliance, so the issue of how the money is going to be paid or how much money is to be paid, the board would not decide that in the unfair labor practice trial. You'll see often in our orders, the board says we're leaving that to compliance, and this would be one of those issues. If there are no further questions. Thank you, Kelsey. Thank you. We'll hear from the attorney for the buried employer. That's right. Multiple employers. A couple facts I want to highlight. Party Shuttle Tours has no employees and no income, no revenues. In 2015, New York Party Shuttle closed its operations and no longer hired tour guides, so certainly no back pay should run past that date. Number three, and I think this is enormous because it vitiates almost the entire back pay award, is that Flancer never earned $335 a week from his own business while holding another job. That is conclusively proven in the record. They don't respond to that fact, and we weren't allowed to re-cross-examine Ms. Kurtzelbehn on that fact. That should at least result in a remand for the ALJ to redetermine what should be the calculation once you take that out. They shouldn't get another chance to prove that he earned that money. That's been decided, but the calculation itself should be re-examined based on that $335 coming out. Fourth, Flancer admitted under oath that he engaged in no moonlighting in 2011. Not only did he swear to it in the hearing, but his 2011 tax return also confirms he had a zero for that income. What happened was he worked until New Year's Eve for New York Party Shuttle. He never worked again for New York Party Shuttle despite the fact that the determined termination date was February 12th. That means zero tours all of January and the first 12 days of February. Why? Seasonality. That proves that the NLRB should have taken into account the fact that he wasn't going to get $335 a week during those weeks, and he wasn't going to work at New York Party Shuttle every year during that time, but they didn't do that. Then in 2012, now that he's been no longer working at New York Party Shuttle, he puts a Groupon up. They call it the Year of the Groupon, or he did, and he operates his own tour like crazy, and he generates some income. But in every year after that, 2013 forward, he worked at at least one other employer. Remember, this is a man who in seven years worked for 12 different employers. But the NLRB wants you to believe that for those seven years he would have been at New York Party Shuttle the entire time, and we would have had to pay him all that money. There's no substantial evidence to support that conclusion. Another point I want you all to know, this is not a small thing. If you go in the record and you look, there are five or six or seven compliance specifications issued in this case. That's not unusual. Because what happens is these proceedings take a while. Years go by while they're taking place. So there's more back pay earned. So what the NLRB does is they come out and they issue a third amended compliance specification, and they add six more months of back pay. And then more time goes by, they issue a fourth. That's not unusual. But if you look at them, every single one of them has a different back pay number for 2012. Crazy. That doesn't make any sense. The reason is because there's no basis for this finding. You guys asked the question, what happens if you determine that the comparator employee plan was incorrect, for instance, or that for 2014 to 2018? The answer is remand the case to the ALJ, to the board to go to the ALJ, for a new determination of what should be the back pay calculation. If the board technically, there's evidence in the record, there are spreadsheets and reports where you can scratch off numbers and then totals, so technically the board could do it. But at the end of the day, we shouldn't have new evidence on what was the back pay. And if this court determines that the comparator employee approach was wrong, which we argued from day one, or that Mr. Jorge was an improper comparator employee, then this court has to render a decision that they didn't meet their burden. We had no burden at that point. If they chose the wrong method or they chose the wrong employee, that justifies a remand and a zero award because we went through a multi-day trial where they didn't meet their burden. In addition to that, if you find the other way, if you believe that up until 2014 he was a reasonable comparator, you need to reduce his earnings to make him equal with Mr. Flancer. And we live in a crazy world, right? The NLRB has to find some way to calculate these things. What they should have done for sure is what Judge Southwick said a minute ago, the projection of earnings. That would have been the right way to do this with the seasonality and all those things. But even if they made that mistake, adjust for the number of hours. You can't just award Mr. Flancer a windfall because Mr. Jorge worked 30 percent more hours than he did. Thank you for your time. All right, counsel. Thank you both for helping us get a handle on this opinion.